# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFREY CLARK, | § | |
| | § | No. 114, 2019 |
| Defendant Below, | § | |
| Appellant | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID: N1503017606A |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: November 6, 2019
Decided: January 14, 2020

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from Superior Court of the State of Delaware. **AFFIRMED**.

Christopher S. Koyste, Esquire, Wilmington, Delaware, *Counsel for Appellant*.

Abby L. Adams, Esquire, Department of Justice, Wilmington, Delaware, *Counsel for Appellee.*

**TRAYNOR,** Justice:

Jeffrey Clark and two of his associates, Rayshaun Johnson and Christopher Harris, were indicted on charges of murder in the first degree, conspiracy in the first degree, possession of a firearm during the commission of a felony, and possession of a deadly weapon by a person prohibited, for their roles in the shooting death of Theodore "Teddy" Jackson. After Harris pleaded guilty to the conspiracy charge and entered into a cooperation agreement with the State, the Superior Court granted Clark's request that his case be tried separately from Johnson's. Johnson's case went to trial first, and a jury convicted him on all indicted charges. Then, after a nine-day trial in September 2017, a jury found Clark guilty of attempted assault in the second degree—purportedly a lesser-included offense of murder in the first degree, and conspiracy in the second degree, a lesser included offense of conspiracy in the first degree.

Before he was sentenced, Clark moved the Superior Court "to enter a judgment of acquittal for the convicted counts of attempted assault in the second degree, reducing the counts of conviction to counts supported by the evidence; that

is, attempted assault third degree and conspiracy third degree."[1]  The court denied Clark's motion and eventually sentenced Clark to four years' incarceration, followed by descending levels of supervision.

In this direct appeal, Clark makes a single claim—that despite the inescapable fact that Teddy Jackson, the only victim identified in the indictment, is dead, the State failed to present sufficient evidence at trial to support the jury's finding that Clark, at the time of the alleged crime, intended to cause "serious physical injury." And because intent to cause "serious physical injury," as opposed to mere "physical injury," is an element of attempted assault in the second degree, according to Clark, the Superior Court erred when it denied his post-trial motion for judgment of acquittal.  For the reasons that follow, we conclude that Clark's claim is without merit, and we therefore affirm the Superior Court's judgments of conviction.

## Facts and Procedural History

On April 3, 2014, a young man approached Doris Reyes, the mother of one of Clark's children, and delivered a threatening message intended for Clark.  The young

---

[1] App. to Appellant's Opening Br. A334 (hereinafter "A__").  For the purpose of this appeal, the relevant difference between attempted assault in the second degree and attempted assault in the third degree is the seriousness of the intended injury to the victim.  "Serious physical injury" must be intended to support the second degree assault charge, while mere "physical injury" is required for third degree assault.  Attempted assault in the second degree is a felony, while attempted assault in the third degree is a misdemeanor.  And because conspiracy in the second degree applies to the promotion or facilitation of a felony, a reduction of Clark's attempted assault conviction to a misdemeanor level would dictate a commensurate reduction of his conspiracy conviction.

man referred to a "situation he had with [Clark] years ago" and told Reyes and her daughter, "When you see Jeff, say goodbye to him because that will be the last time you see him."[2] Reyes relayed the message to Clark by telephone, who became aggravated and upset upon hearing this news.[3] Clark was with co-defendants, Harris and Johnson, when he received the call from Reyes describing the threatening encounter.

Harris testified that Clark appeared upset and irate, and wanted to find the man who made the threat so that he could "do something to him."[4] Clark believed that the young man who made the threat was named Kyle, and Clark "wanted to fight" him.[5] Clark told Reyes "not to worry," assuring her that "he wasn't going to let anything happen" to her or their child.[6] Clark explained that, "[i]f he had to take him in the middle of the street, fight him, then he would."[7] Reyes informed Clark that Kyle was wearing "Army fatigue pants and a black shirt, or black jacket."[8] Thereafter, Clark "took off running, looking for Kyle."[9]

---

[2] A128.
[3] *Id.*
[4] A139–40.
[5] A261.
[6] A128.
[7] A130.
[8] A261–62.
[9] A262.

Clark, Johnson, and Harris spent the evening searching for Kyle. During their pursuit, they encountered Marcel Swanson at a nearby corner store. Clark asked Swanson about Kyle and explained that he had disrespected someone in his family. Swanson described Clark's demeanor during their interaction as "angry" and "real aggressive."[10] Swanson also noted that Clark was shirtless, wearing "black jeans and. . . red shoes,"[11] with a gun tucked in his waistband.

The three men left the store in a car driven by Bryshere Giles and continued searching for Kyle. When they saw someone matching Kyle's description, they parked the car. Next, according to Harris's testimony, Johnson and Clark exited the car wielding firearms. Shortly thereafter, Harris heard approximately ten gunshots, then Clark—still sporting black pants and red shoes—and Johnson "ran back to the car."[12] Upon their return, they told Giles to drive away and said "we got him."[13] The victim was actually a man named Teddy Jackson, who died that evening as the result of multiple gunshot wounds.

Marcel Swanson's testimony corroborated Harris's in several material respects. Swanson was also at the corner store, when he saw Clark, Johnson, and

---

[10] *Id.*
[11] A60.
[12] A141.
[13] A141.

Harris "hop in the car and take off."[14]  Swanson left the store and walked in a southerly direction on Van Buren Street.  He then heard several gunshots and, in short order, saw Clark and Johnson "running towards the car,"[15] which left the scene. As Swanson continued to walk to his home, he saw "a man on the ground"[16] and "smelled the gun powder."[17]

Five or so minutes after Swanson heard the gunshots, Johnson called him on the phone.  Swanson recounted for the jury what Johnson had to say:

> He tells me, remember the guy Kyle that we was looking for? Well, I think we found him.  I think we got him.[18]

During that conversation and again later that evening, Swanson informed Johnson that the person he saw on the ground "could have been the wrong person."[19] Swanson was right—Clark and Johnson got the wrong person.  It was Teddy Jackson—not "Kyle"—who the police found lying in the street with multiple gunshot wounds.  They also found two different types of numerous shell casings.

Clark testified in his own defense.  Although he acknowledged that, after Reyes relayed Kyle's threat, he "wanted to fight Kyle,"[20] he attempted to pin the shooting of Jackson on Johnson and Harris.  Clark told the jury that, after dropping

---

[14] A61.
[15] A62.
[16] *Id.*
[17] A63.
[18] *Id*.
[19] *Id.*
[20] A261.

6

off two of his children at Johnson's mother's house, he got into Bryshere Giles' car with Johnson, Harris, and Harris's female companion, Adrian Moody. The group traveled to Second and Harrison where Reyes provided additional information about the person who had threatened Clark, including that he was wearing Army fatigue pants and a black shirt or jacket. Armed with this information, Clark removed his earrings, nose ring, and his shirt, and "took off running, looking for Kyle."[21]

According to Clark's testimony, he was unable to find Kyle, so eventually he and the others got back in Giles' car. As the group cruised around the neighborhood continuing to look for Kyle, Harris and Johnson spotted Marcel Swanson so Giles stopped the car so that they could talk with Swanson. Clark admitted that he was "still kind of aggressive" and personally asked Swanson if he had seen Kyle; Swanson said that he had not.

To this point, Clark's testimony did not conflict materially with Swanson's and Harris's testimony. Thereafter, however, there was a radical difference. Clark testified that, after the encounter with Swanson, he got back in Giles' car and put his shirt and earrings back on and replaced his nose ring. According to Clark, as Giles was driving away, Harris noticed a man on the street who fit the description that Reyes had provided, and Johnson ordered Giles to pull over. Clark claimed that he tried to persuade Harris and Johnson that the person who had attracted their attention

---

[21] A262.

7

was not Kyle but that his efforts were unavailing. Clark then testified that Johnson and Harris, both armed—Johnson with a silver Smith & Wesson semiautomatic firearm and Harris with an "all-black semiautomatic"—got out of the car, after which Clark heard several gunshots. Once the shooting stopped, under Clark's version, Johnson, with his "firearm ajar,"[22] and Harris, with his "weapon . . . still intact,"[23] got back in the car. Giles, Johnson, and Clark then returned to Johnson's mother's house, where Clark collected his children, having left them there in Johnson's mother's care so that he could hunt for Kyle, got in his vehicle, and went home.

Lest this recitation of the basic facts adduced at trial leave the impression that the jury's determination hinged solely on a credibility battle between Harris and Swanson on one side and Clark on the other, it bears noting that there was other evidence tending to corroborate Harris's and Swanson's testimony. For instance, consistent with Swanson's observation that the person who approached him earlier looking for Kyle and later running to the car after the gunshots were heard was wearing red shoes, the police found two pairs of red Chuck Taylor Converse sneakers—one high-top and one low-top—during their search of Clark's residence.

More damning yet was the testimony of Ronald Jackson, Teddy Jackson's cousin who was housed in the same pod as Clark at Howard R. Young Correctional

---

[22] A263.
[23] *Id.*

Institution ("HRYCI") in November 2016, ten months before Clark's trial. After overhearing Clark comment on what Jackson interpreted to be the shooting of his cousin, Jackson asked Clark if he was in HRYCI for shooting Teddy Jackson. Clark admitted that he was and tried to apologize, telling Jackson at first that "he was there but he didn't actually do it."[24] Jackson later overheard Clark tell others that "he got out of the car, but . . . told his lawyer that he didn't get out of the car."[25] Jackson also heard Clark say that there were three guns involved, saying that there was "a nine, a .40 and . . . a 38,"[26] and that Clark and his friends "all shot but his friends [were] the ones who . . . initially started shooting . . .."[27] Thereafter, in direct conversation with Jackson, Clark said that "he shot . . . [but] that he didn't shoot [Jackson's] cousin."[28]

During the prayer conference that preceded the parties' closing arguments, Clark requested—despite Teddy Jackson's death— that the court instruct the jury on the lesser-included offenses of attempted assault third degree (under the murder in the first degree count) and conspiracy in the third degree (under the conspiracy in the first degree count). As noted by the Superior Court in its post-trial order, "[Clark]

---

[24] A196.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] A197.

also agreed that there was a rational basis in the evidence for instructions on attempted assault second degree and conspiracy second degree."[29]

Implicit in Clark's argument during the prayer conference and now explicit in his argument before us was his contention that the jury could find that he was innocent of Teddy Jackson's killing but subject to conviction of an attempted assault on the young man named Kyle, who was never found. The State objected, noting that Clark was not indicted on an unconsummated assault of Kyle and that attempted assault was not a lesser-included offense of the charged offense—murder in the first degree. Nevertheless, the court granted Clark's request, but added instructions for attempted assault second degree and conspiracy in the second degree.[30]

Most relevant to Clark's argument on appeal are the attempted assault instructions, which were as follows:

> In order to find the defendant guilty of attempted assault in the second degree as an included offense of Count I of the indictment, you must find that all of the following elements have been established beyond a reasonable doubt: *The defendant attempted by his own voluntary act to cause serious physical injury to another person*; two, the defendant's acts, under the circumstances as he believed them to be, constituted a substantial step in a course of conduct planned to culminate in his commission of the crime of assault in the second degree; and three, the defendant acted intentionally.

---

[29] *State v. Clark*, 2018 WL 7197607, at *3 (Del. Super. Ct. Oct. 1, 2018).

[30] The Superior Court explained the range of lesser-included offense options given to the jury as follows: "The jury was instructed on charges of murder first degree, and—as lesser-included offenses thereof—murder second degree, attempted assault second-degree and attempted assault third degree; the jury also received instructions also on conspiracy first degree and—as lesser-included offenses thereof—conspiracy second degree and conspiracy third degree." *Id.*

10

* * *

[I]n the event you are at an impasse and are unable to reach a unanimous verdict on the charge of attempted assault in the second degree, you should then consider the included offense of attempted assault in the third degree.

* * *

In order for a defendant to be found guilty of attempted assault in the third degree as an included offense of Count I of the indictment, you must find that all of the following elements have been established beyond a reasonable doubt:  The defendant attempted, by his own voluntary act, to cause physical injury to another person; the defendant's acts under the circumstances as he believed them to be constituted a substantial step in a course of conduct planned to culminate in his commission of the crime of assault in the third degree; and, three, the defendant acted intentionally. [31]

The court also instructed the jury on the concepts of accomplice liability and transferred intent.

In his closing argument, Clark argued that the jury should reject the testimony of Swanson and Harris and accept his version of the relevant events in its entirety. And because Clark said that he only wanted to fight the man named Kyle and took no part in the shooting of Teddy Jackson, he was blameless on the murder charges, including the conspiracy to commit murder.  Clark, however, having admitted on the stand that he intended to injure Kyle—though not seriously—invited the jury to convict him of attempted assault in the third degree.  The State countered Clark's

---

[31] A320 (emphasis added).

11

contention that the evidence did not support a finding that Clark intended to cause Kyle (or anyone else) serious physical injury by noting that "[y]ou don't bring guns to fistfights."[32] According to the State, Clark's protracted—and agitated—search, while armed, of a person who had threatened to kill him shows that Clark intended to shoot and kill Kyle. The State also argued that, even if Clark was not the shooter who caused Teddy Jackson's death, he was still culpable under the concept of accomplice liability.

As mentioned at the outset, the jury convicted Clark of attempted assault in the second degree and conspiracy in the second degree. Before he was sentenced, Clark moved under Superior Court Criminal Rule 29(c) for judgment of acquittal challenging the sufficiency of the evidence on the "serious physical injury" element of attempted assault in the second degree. In his motion, Clark emphasized that '[a]t issue . . . [was] the sufficiency of the evidence in relation to what kind of harm or injury . . . Clark attempted to inflict upon Kyle."[33] He contended that, "at best, [the evidence] demonstrated an attempt to cause physical injury, not serious physical injury"[34] and, therefore, asked the court to reduce his felony level attempted assault and conspiracy convictions to misdemeanor attempted assault and conspiracy convictions.

---

[32] A301.
[33] A347.
[34] A345.

12

In the Superior Court's analysis of Clark's novel argument, in which the court appears to have recognized that the actual victim of Clark's crime was Teddy Jackson,[35] it did not assign any weight to Jackson's death in its assessment of the kind of harm or injury that Clark intended to inflict on the victim of his wrath. Instead, the court indulged Clark and limited its inquiry to his conduct in preparation for the never-consummated encounter with Kyle. After a careful analysis of all of the evidence, the court concluded that a reasonable trier of fact could find beyond a reasonable doubt that Clark intended to cause serious physical injury to another on the night he hunted—but did not find—Kyle. The court therefore denied Clark's motion for judgment of acquittal and sentenced him as described above. This appeal, challenging the Superior Court's denial of the motion, followed.

## Discussion

"On appeal from the denial of a motion for judgment of acquittal, this Court decides *de novo* whether any rational trier of fact, viewing the evidence in light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of all the elements of the crime. For the purposes of this inquiry, this Court does not distinguish between direct and circumstantial evidence of defendant's guilt."[36]

---

[35] The court was satisfied that the trial record showed that "'Kyle' . . . was the object of Clark's ire on the night of his crimes and Clark's intended target for retaliation. Teddy Jackson was, unfortunately, dressed in a manner similar to 'Kyle' that night and became the innocent victim of Clark's and his friends' efforts to exact that retaliation." *State v. Clark*, 2018 WL 7197607, at *1 n4. (Del. Super. Ct. Jan. 30, 2019).

[36] *Cline v. State*, 720 A.2d 891, 892 (Del. 1988) (footnote omitted).

On appeal, Clark refines his argument in support of his contention that the evidence was insufficient to support a finding that he intended to cause serious physical injury to anyone on the night Teddy Jackson was shot. In particular, Clark has now clarified that, under his argument, the intended victim of the attempted assault was Kyle and, therefore, the jury was required to limit its inquiry—and that, correspondingly, we are to limit our appraisal of the sufficiency of the evidence—to what type of injury he intended to inflict on Kyle, if he had only found him, and not on the injury actually inflicted on the murder victim—Teddy Jackson—named in the indictment. According to Clark, because his intent was to engage in a run-of-the-mill street fight with Kyle—the kind of fight that typically does not result in serious physical injury—he should not have been convicted of attempted assault in the second degree.

Under the Delaware Criminal Code, "[a] person is guilty of assault in the second degree when . . . [t]he person causes serious physical injury to another person."[37] "Serious physical injury" is defined by the Delaware Criminal Code as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of function of any bodily organ . . . ."[38] In contrast, mere "'physical

[37] 11 *Del. C.* § 612(1).
[38] 11 *Del. C.* § 222(26).

14

injury' means impairment of physical condition or substantial pain.'"[39]  And as the court instructed the jury, "[a] person is guilty of an attempt to commit a crime if the person . . . [i]ntentionally does or omits to do anything which, under the circumstances as the person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person."[40]  Finally, that "[t]he actual result differs from that intended or contemplated, as the case may be, only in the respect that a different person . . . is injured" will not negate the element of intention or knowing causation.[41]

Clark's argument that the evidence that he intended to cause serious physical injury was deficient fails for three very simple reasons.  First, even if we were to accept the dubious premise that the only relevant question was what Clark intended to do to Kyle as opposed to what he or his co-conspirators actually did to Teddy Jackson, the evidence easily supports a finding that Clark intended to seriously injure Kyle.  Second, Clark's argument rests on a flawed premise—that though he was charged with the murder of Teddy Jackson, that murder charge somehow includes a lesser offense of attempting to assault an unknown and unrelated person named 'Kyle.'  And third, if, as Clark urges, the attempted assault of Kyle is truly a lesser

---

[39] 11 *Del. C.* § 222 (23).
[40] 11 *Del. C.* § 531(1).
[41] 11 *Del. C.* § 262(1).  This is known as the doctrine of transferred intent.

included offense of the murder of Teddy Jackson, then the harm suffered by Jackson, standing alone, provides sufficient evidence of the harm Clark intended for Kyle.

For starters, Clark himself admitted that he intended to harm Kyle and engaged, in the Superior Court's words, in a "frenzied search"[42] so that he could do so. This characterization is supported by the evidence, which included Clark's own description of how he doffed his shirt, earrings, and nose ring before running down the street in search of Kyle. As aptly noted by the Superior Court, witnesses described Clark's demeanor variously as "upset," "aggravated," "aggressive," "real aggressive," "irate," and "real angry," as he searched for Kyle.[43] Clark, moreover, did not set upon his task alone but, instead, enlisted the assistance of two friends. In contrast to the impromptu street fight that Clark claims was in the offing, the evidence paints a picture of an enraged Clark intending to carry out a violent premeditated attack on Kyle. Accordingly, the Superior Court found—correctly, we conclude—that the jury could draw reasonable inferences from this evidence that would support a finding beyond a reasonable doubt that Clark was enraged and intended to cause Kyle serious physical injury.

That alone would be fatal to Clark's argument and sufficient to sustain the Superior Court's ruling. But the Superior Court's review of the evidence appears

---

[42] 2018 WL 7197607 at *5.
[43] Ex. A to Opening Br. at 4, 6–7.

not to have considered perhaps the most salient fact—Clark armed himself with a firearm in anticipation of his confrontation with Kyle.[44] This fact is supported by Swanson's testimony and Clark's jailhouse admission to Ronald Jackson. And it would be eminently reasonable for a juror to conclude beyond a reasonable doubt that, given Clark's mental state, had he found Kyle, he would have used the firearm to cause, at a minimum, serious physical injury.[45]

The sufficiency of the evidence for "serious physical harm" aside, Clark's theory also contains a legal error. Clark has yet to explain how the offense that he says should be the sole focus of our review of the sufficiency of the evidence—an uncharged attempt to assault Kyle, entirely divorced from the actual shooting of Teddy Jackson—falls within this statutory definition of included offenses. Our Criminal Code sets the parameters for a jury's consideration of lesser-included offenses in subsections (b) and (c) of 11 *Del. C.* § 206. Notably, subsection (b) states

---

[44] Clark would have us ignore this fact because the jury acquitted him on the weapons charge. But under our inconsistent-verdict jurisprudence, we are not as constrained by that acquittal as Clark suggests. "Under the rule of jury lenity, this Court may uphold a conviction that is inconsistent with another jury verdict if there is legally sufficient evidence to justify the conviction." *King v. State*, 126 A.3d 631 (TABLE), 2015 WL 5168249, at *2 (Del. Aug. 26, 2015) (citing *Tilden v. State*, 513 A.2d 1302, 1306-07 (Del. 1986); see also *Graham v. State*, 171 A.3d 573 (TABLE) 2017 WL 4128495, (Del. Sept. 18, 2017) (upholding resisting-arrest-with-force-or-violence conviction despite jury's acquittal on offensive-touching charge.)

[45] *See Lewis v. State*, 977 A.2d 898 (TABLE), 2009 WL 2469254, at *3 (Del. Aug. 13, 2009) (An accomplice who knew or should have known that a handgun would be used during a robbery had the required individual culpability necessary for a conviction of attempted assault in the second degree.).

that "[a] defendant may be convicted of an offense *included in an offense charged in the indictment or the information*."[46] The statute then describes when an offense is considered to be "included." Pertinent to this case, "an offense is so included when . . . it is established by the proof of the same or less than all the facts required to establish the commission of the *offense charged*."[47] Subsection (c) of § 206 limits the court's obligation to charge the jury with respect to an included offense to those instances where "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the *included offense*."[48] At oral argument, Clark's counsel effectively admitted that the attempted assault and related conspiracy convictions that he believes should have been reduced from felonies to misdemeanors were not offenses "included" in the indictment's murder in the first degree count but are the result of Clark's admissions during his trial testimony to the commission of other uncharged crimes.[49] We reject this effort by Clark to shift the focus of this Court's analysis from the crimes charged and other offenses "included"—as defined by § 206—in those crimes to an uncharged crime of Clark's choosing.

---

[46] 11 *Del. C.* § 206(b) (emphasis added).
[47] 11 *Del. C.* § 206(b)(1) (emphasis added).
[48] 11 *Del. C.* § 206(c) (emphasis added).
[49] Oral Argument Video at 6:03–7:54, https://courts.delaware.gov/supreme/oralarguments/download.aspx?id=3266.

But even if we were to accept Clark's argument that the attempted assault on Kyle was a lesser included offense of Teddy Jackson's murder, his argument would still fail for one compelling reason: if the basis for instructing the jury on the attempted assault charge is that it is a lesser included offense under the indictment's murder in the first degree count, then we must assess the sufficiency of the evidence of Clark's intent in relation to the injury intended to be inflicted upon Teddy Jackson, the victim of multiple gunshot wounds. Put another way, the jury was free to consider the fate that befell Teddy Jackson in assessing what Clark and his compatriots intended for Kyle—because the attempted assault on Kyle is a lesser included offense, established by "the same or less than all the facts required to establish the" charge of Teddy Jackson's murder.[50] And it goes without saying that the multiple shots fired at Jackson were intended to cause, at the very least, prolonged disfigurement and impair his health; in the event, they caused his death.

When we train our attention on the crimes charged in the indictment, our task is simplified. Clark was charged with shooting or participating in the shooting death of Teddy Jackson. Clark himself acknowledged that, if a trier of fact were to credit Swanson's and Harris's testimony, a guilty verdict on the murder in the first degree

---

[50] 11 *Del. C.* § 206(b)(1).

19

charge would be unassailable on sufficiency of the evidence grounds.[51]  He also agreed that the crime committed against Teddy Jackson was more than an attempt— it was murder.[52]  It follows as a matter of logic that if the evidence was sufficient to sustain the offense charged, it is necessarily sufficient to sustain a conviction of any offense included in it.

## Conclusion

The judgments of conviction of the Superior Court are affirmed.

---

[51] Oral Argument Video at 8:40–9:20, https://courts.delaware.gov/supreme/oralarguments/ download.aspx?id=3266.
[52] Oral Argument Video at 14:36–14:47, https://courts.delaware.gov/supreme/oralarguments/ download.aspx?id=3266.